FREDRICKSON, Respondent, vs. KABAT and others, Appellants.

*March 4—April 6, 1954.*

For the appellants there were briefs by *Johns, Roraff, Pappas & Flaherty* of La Crosse, and oral argument by *Robert D. Johns.*

For the respondent there was a brief by *Hale, Skemp, Nietsch, Hanson & Schnurrer* of La Crosse, and oral argument by *Quincy H. Hale.*

BROWN, J.   Plaintiff Fredrickson was chairman of a 1949 New Year's Eve party held at the American Legion clubhouse in La Crosse. The appellants-defendants, their wives, and some other friends attended the party in a group. At closing time defendant Kabat engaged in a dispute with another patron over the ownership of a hat and the argument reached a stage where plaintiff thought it best to put Kabat out of the clubhouse. He took hold of Kabat, who did not resist, and walked him out the door and onto the porch. The other members of Kabat's party followed them and testimony as to what happened on the porch conflicts but by the time when it becomes again undisputed Fredrickson's left arm had been twisted out of the shoulder socket and the bone below the joint completely broken off, and his left kneecap fractured. The arm will ultimately need amputation. The Fredrickson version of the occurrence is that when he released Kabat at the outer door Kabat turned to face him and at the same time Fredrickson was seized from behind by the two Kot-

nours, his arms drawn behind his back and the left one twisted upwards, back of his neck, while he was forced down to the floor with such violence that his kneecap was broken; that his son came to his rescue but that defendant Joe Kotnour dragged the son away by the throat and that defendant Opitz stepped in to aid Joe. Fredrickson's wife and the son, Richard, corroborated the plaintiff in all important respects. The appellants did not deny that Fredrickson sustained the injuries mentioned and, in the main, their testimony and that of their wives support the theory of the defense that in some way which appellants cannot explain, because none of them saw the initial cause or had any part in it, Fredrickson fell down and hurt himself.

The only questions submitted by the appellants for decision here are whether there is sufficient evidence in respect to each separate appellant to sustain the finding that he assaulted the respondent. Although this is a civil action it is founded upon an alleged assault and battery, and, therefore, the plaintiff must establish the offense by a clear and satisfactory preponderance of the evidence. *Bursack v. Davis* (1929), 199 Wis. 115, 122, 225 N. W. 738; *Peterson v. Lemke* (1915), 159 Wis. 353, 150 N. W. 481. Appellants quote statements made by Fredrickson upon adverse examination before trial and other statements he made soon after receiving his injury to show that at such times he was unable to name the persons whom he said assaulted him and that later, when he did identify them, his description of their activities differs from the parts he assigned to them in his testimony upon the trial. These discrepancies raise issues of credibility which are to be determined by the jury.

The testimony of the Fredricksons on the trial is clear, direct, and positive, and is entirely adequate to sustain the verdict unless it can be said that the inconsistent statements before trial have reduced its strength below the level of a clear and satisfactory preponderance of the evidence. The

jury, however, was not confined to the testimony given by the plaintiff and his relatives. Defendants' own evidence gives plaintiff much corroboration. Ray Kotnour, who was found by the jury to have participated in the assault and battery by the use of physical violence, testified that as he came out onto the porch following Fredrickson and Kabat he saw Fredrickson falling to his left and backward and attempted to catch him and, standing behind Fredrickson, he put his right arm around Fredrickson and with his left hand grasped Fredrickson's left arm. His grip was insufficient to prevent the fall, Kotnour testified, and he then assisted Fredrickson to rise. Others of the Kabat faction testified that they saw Ray Kotnour bending over Fredrickson with his hands upon Fredrickson. They interpreted the position as one of mercy. If the jury chose the respondent's interpretation of Ray's purpose in seizing Fredrickson it is clear that Ray participated in the assault by the use of physical violence and the jury may well have thought that the fracture of Fredrickson's left kneecap was more consistent with the theory that he was thrown to the floor by one or more men who were twisting his left arm up behind his back and neck than with the idea that he simply fell backward into the arms of a saviour.

The jury found that Joe Kotnour, too, participated in the assault by the use of physical violence. Fredrickson, as we have said, testified at the trial that Joe had him by one arm. Several of defendants' witnesses testified that Joe was at least very close to Fredrickson when Fredrickson went to the floor and that Richard Fredrickson, misunderstanding the friendly purpose of the group, attempted to drive them away from his father. It is not disputed that at this point Joe took Richard by the throat, thrust him against the wall, and held him there until Ray had finished his business with the elder Fredrickson, whatever that might have been. If that

business was malign, as the jury found it was, Joe's guilt of participation by violent means does not require that his violence be imposed on respondent's person. That his means were violent is self-evident and that they were in aid of Ray by preventing Richard from interfering with him is equally plain.

Defendant Opitz's own testimony was that when he saw Joe Kotnour drive Richard Fredrickson away from Ray Kotnour, he handed his overcoat to Mrs. Opitz to hold and joined Joe to make certain that Joe could contain Richard. Ray's freedom of action was thus assured and, if an assault by Ray Kotnour upon Fredrickson be granted, Opitz's participation in it by the use of other than physical violence is clearly established. See *Hilmes v. Stroebel* (1883), 59 Wis. 74, 17 N. W. 539, in its reference to defendant Herman at page 76. The jury found Opitz so participated.

The jury found that defendant Kabat also participated in the assault by the use of other than physical violence. It was Kabat whom the other appellants were trying to rescue or avenge. He did bend over the body of Fredrickson, he says to help Fredrickson, but Fredrickson testified that when he had regained his feet Kabat used foul language to him. If the jury believed this it could reasonably doubt that Kabat's purpose and behavior were more in accord with the character of a Samaritan than his language was. A mere bystander at the commission of an assault and battery does not become liable as a participant because he does not interfere to prevent it. *Rhinehart v. Whitehead* (1885), 64 Wis. 42, 45, 24 N. W. 401. But " '. . . evidence that a person is present at the commission of an assault and battery, without disapproving or opposing it, is evidence from which, in connection with other circumstances, the jury may infer that he assented thereto, and lent to it his countenance and approval, and was

thereby aiding and abetting the same.' " Idem. Such "other circumstances" which the jury could, and doubtless did, connect and consider are that Kabat's conduct inside the club caused Fredrickson to eject him, that Kabat particularly resented this because, as he testified, he was a veteran and Fredrickson "was probably not even overseas," that his friends were acting to avenge him and that he used foul language to Fredrickson immediately after their act. Kabat has not attempted to disassociate himself from the others of his group. We do not think he can do so and if they participated in an assault he was a participant also under the rule of the *Rhinehart Case, supra.*

As far as appellants are concerned, though they were within a few feet of Fredrickson when he sustained his injuries and were quite aware that he was ejecting one of their number, they have no idea what caused him to fall. At one moment he was standing safe and well with the appellants gathered around or coming toward him. For a moment they looked away and in that instant, though there was no disturbance that any of them observed, he mysteriously fell to the floor and, in spite of their efforts to keep him from harm, when they had him on his feet again he was maimed for life. It appears to us that there is an inherent improbability in the version which the several appellants gave of the occurrence and that the evidence of Mrs. Kabat, their witness, points the way to the truth. Mrs. Kabat testified that she went through the outer door ahead of Fredrickson and her husband, stepped down from it, looked back and "I had this vision of shoving and pushing. . . . I couldn't figure out what was happening. . . . It was just like a free-for-all. All of a sudden Mr. Fredrickson went down on the floor."

Credibility of witnesses is for the jury and we have no doubt that evidence here which the jury was entitled to be-

448

lieve furnishes a clear and satisfactory preponderance in support of the verdict respecting each appellant.

*By the Court.*—Judgment affirmed.