ESTATE OF JOSLIN: JOSLIN, Appellant, vs. HENRY and others, Respondents.

*April 7—May 6, 1958.*

For the appellant there was a brief by *Darrell D. Mac-Intyre,* attorney, and *George E. Hass* of counsel, both of Madison, and oral argument by *Mr. MacIntyre.*

For the respondents there was a brief and oral argument by *Frederick F. Hillyer* of Madison.

CURRIE, J.   The narrow issue on this appeal is whether the finding by the trial court that the insane delusion of testatrix did not affect the making of the propounded will and codicil, is against the great weight and clear preponderance of the evidence. This necessitates a review of the material evidence bearing on such issue.

Mr. Joslin was born November 15, 1872, and Mrs. Joslin was approximately of the same age, the testimony disclosing that she was eighty-one or eighty-two years of age when she executed her will in 1953. They were married April 16, 1898, and had no children. For approximately the first twenty-two years of their married life they were both employed in state mental institutions, first at Mendota State Hospital in Wisconsin, and thereafter in similar institutions in South Dakota and Nebraska. In 1910 or 1911, they bought a farm near Oregon, Wisconsin, with their accumulated savings. Title was taken in joint tenancy. Mrs. Joslin helped with the farm work, even to the extent of working in the fields. About 1942, they sold the farm and bought a home in the village of Oregon, again taking title in joint tenancy.

About the time of moving to Oregon to live, or shortly thereafter, Mrs. Joslin began to be afflicted with delusions that her husband was flirting with other women, and these delusions grew in intensity and scope until by the time she executed her will in 1953 she was obsessed with the belief that her husband was carrying on adulterous relations with Mrs. F. ———, a neighbor, right in the home of the parties after Mrs. Joslin had retired for the night. Mrs. Joslin nailed shut the windows of the house facing the F. ——— home, coated the windowpanes with paint, and nailed blankets over the inside of such windows, for the purpose of preventing Mr. Joslin from being able to signal to Mrs. F. ———. Mrs. Joslin lodged complaints with the village police officer as to her husband harboring other women in the home while she also was in the house. The trial court found in its memorandum opinion that there was no foundation whatever in any conduct of Mr. Joslin for such delusions.

After moving to Oregon, Mr. Joslin acted as a salesman for a woolen company selling merchandise from door to door. Mrs. Joslin had always handled the money of the couple and he turned over the proceeds of his sales to her. Because of her delusions that he was flirting with other women and spending money foolishly upon them, she refused in 1947 to give him the necessary money to pay for the merchandise required for carrying on his sales activities. Up to this point the parties held title to their personal property, as well as their homestead, in joint tenancy. As a result of the difficulty experienced by Mr. Joslin in obtaining money to carry on his selling activities, the parties went to a bank and made an equal division of their personal property aggregating $35,441, consisting of money in savings accounts, bonds, and one note and mortgage. After such division in 1947, each thereafter maintained his or her own bank accounts.

In November, 1949, Mr. Joslin visited a sister in Minneapolis for two months, and then went to Albuquerque, New

Mexico, and lived with a niece and her husband, returning to Oregon in April, 1950. While in New Mexico, he purchased a house there for $8,000 and took title in his name alone, which property he rented. The record is silent as to whether Mrs. Joslin ever knew of such purchase. Mrs. Joslin paid her own expenses and one year's taxes on the Oregon homestead while her husband was away.

A day or two before Mrs. Joslin executed her will in October, 1953, she called at the office of Attorney Hayes in Oregon, and gave him the necessary information and directions for drafting her will. She had consulted him on other occasions and had discussed the delusion that her husband was flirting with other women. On one occasion she had requested Mr. Hayes to institute a divorce action against her husband, which Mr. Hayes discouraged. However, neither on the day she gave him the directions for drafting her will, nor on the day that she signed it, did she mention any misconduct of Mr. Joslin with other women. Mr. Hayes inquired as to whether she wished to bequeath anything to her husband and she replied in the negative. She explained that each of them had his or her separate property and each could dispose of it as he or she saw fit. She also mentioned that the homestead was in joint tenancy and her husband would receive that property on her death.

The codicil of November 19, 1954, was also drafted by Attorney Hayes, and merely revoked two small legacies, one for $300 and the other for $100.

The brief in behalf of the proponents also stresses acts of indifference on the part of Mr. Joslin after Mrs. Joslin became ill in 1955 and went to a nursing or old peoples' home to live. We deem such evidence to be entirely immaterial in passing upon the motives which actuated Mrs. Joslin in making the testamentary disposition of her property which she did in 1953, because it relates to events which occurred after the making of the will.

In *Will of Shanks* (1920), 172 Wis. 621, 624, 179 N. W. 747, this court declared:

"It is not a question whether testator had general testamentary capacity, for many persons laboring under insane delusions may be competent to make a will (*Will of Cole,* 49 Wis. 179, 5 N. W. 346), but whether the insane delusion under which the testator suffered materially affected the will he made. In other words, is it reasonably certain that but for the insane delusion his wife would have received a materially larger devise?"

The foregoing extract from *Will of Shanks, supra,* was quoted with approval by this court in the recent case of *Will of Riemer* (1957), 2 Wis. (2d) 16, 32, 85 N. W. (2d) 804.

The trial court, as a reason for holding that the insane delusion of Mrs. Joslin did not materially affect the testamentary disposition of her property whereby she bequeathed nothing to her husband, stressed the property division of 1947 which took place between the parties. However, the motivating cause for such property division was Mrs. Joslin's harboring of the delusion that her husband was squandering money on other women. This was what prompted her in denying him funds to carry on his business which in turn precipitated the property division. We thus consider it to be logically impossible to separate the delusions from the property division and to hold that one was a motivating force in the making of the will and not the other.

We have here a record of a couple who by 1942 had been apparently happily married for forty-four years. All that they owned was in joint tenancy so that the survivor would take all upon the death of either. Then the wife becomes obsessed with unfounded delusions that her husband is squandering his money on other women and this leads to the division of their personal estate. The wife's insane delusions grow worse and before she executes her will in 1953 she is

convinced that her eighty-year-old husband is committing acts of adultery. The will bequeaths nothing to the husband. We deem it to be an entirely unrealistic hypothesis, that she would have so completely changed her views as to what should happen to her interest in the property upon her death, without the delusions being present.

We concede that it would be likely that Mrs. Joslin might well have wished to make some bequests to her nephews and nieces without the delusions being present. However, we cannot conceive of her bequeathing nothing at all to her husband in the absence of the delusions. If the delusions had such effect then they were material.

There was no medical testimony that Mrs. Joslin ever had lucid intervals when she was free from the delusions. In this respect this case differs from cases such as *Will of Silverthorn* (1887), 68 Wis. 372, 32 N. W. 287, and *Will of Knierim* (1955), 268 Wis. 596, 68 N. W. (2d) 545.

It is our conclusion that the trial court's finding of fact No. 7, that Mrs. Joslin's insane delusions did not affect her testamentary capacity nor control in some degree the testamentary disposition made by her, is against the great weight and clear preponderance of the testimony.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter a judgment denying the propounded instruments to probate.

HALLOWS, J., took no part.

BROWN, J. (*dissenting*). I respectfully dissent. The scrivener testified (appellant's summary) :

"I asked her about her husband and she said she didn't want to leave him anything. She said they made a division of property during their lifetime and she got her one half and he got his one half. I asked her about the house. She

said it was in joint tenancy and that she would like to have it, but it would go to Mr. Joslin if she died first."

There was no other evidence of testatrix's motive in omitting provision for her husband.

In my opinion this makes it perfectly clear that Mrs. Joslin did not cut her husband out of her will because of a belief that he was an adulterer but because of a belief that what he got six years earlier in a division of property was enough for him. There was no delusion about the division or about Mr. Joslin's receipts. They are facts. She stated they were the motivating facts. The will was drawn and executed in recognition of those facts. I consider the events or beliefs which originally caused the property to be divided are immaterial.

The will should be sustained and the judgment admitting it to probate should be affirmed.