WILL OF QUAM: DOKKEN and another, Appellants, v. FEMRITE, Respondent.

*March 7—April 5, 1960.*

22

For the appellants there was a brief by *Vaughn S. Conway* and *Kenneth H. Conway,* both of Baraboo, and oral argument by *Vaughn S. Conway.*

For the respondent there was a brief by *Risser & Risser* of Madison, and oral argument by *Frederic A. Risser* and *Frederic E. Risser.*

CURRIE, J.   The appellant objectors raise the following two issues on this appeal:

(1) At the time the 1943 will was executed was testatrix suffering from an insane delusion which materially affected the making of such will?

(2) Was the will procured through undue influence?

The husband of Mrs. Quam, the testatrix, had predeceased her on February 24, 1941, and she was survived by no children.  Her next of kin consisted of the two Dokken brothers, who were sons of her deceased sister Julia; Clifford Carl Lee and Cordelia Lee Beattie, children of her deceased brother Knudt; and Winston Lee and Jane Lee Hilton, children of the deceased brother Isaac.  Two sisters, Sadie and Mary, had predeceased testatrix leaving no issue.

For many years prior to their respective deaths Mrs. Quam and her husband had resided in the city of Madison. On September 15, 1938, the testatrix had executed a will in which she bequeathed $200 to a Norwegian Lutheran Church at Daleyville in which she had been baptized and confirmed, and all of the residue she bequeathed in equal shares to eight people. These eight consisted of her husband, her sister, Mary, who was then living, and the six nephews and nieces who survived her. The record does not disclose what separate estate she then owned but it must have been very small. This is because she received approximately $15,000 of personalty and the homestead appraised at $4,000 as principal legatee under her husband's will. All of the estate she possessed at time of death is traceable to these assets acquired under her husband's will.

The lawyers who handled the probate of the husband's estate were Sachtjen & Braathen, a Madison law firm consisting of Herman W. Sachtjen, who later became circuit judge, and Sverre Braathen. Martin Haug, the executor, became worried over the way Mrs. Quam, the widow, was handling money matters and consulted with Attorney Sachtjen about having her placed under guardianship. The nephew, Stanley Dokken, who was the only next of kin residing in Dane county, was also consulted, but he refused Haug's request to sign the petition for guardianship. Dokken testified that he also had a conference with Attorney Braathen and informed the latter that "he wouldn't have any part of a guardianship petition." Haug then signed the petition for guardianship, which petition did not allege that Mrs. Quam was mentally incompetent. The sole ground stated in the petition for appointment of a guardian was that "she was unable to care for the same [her property] on account of extreme old age and inability to handle her money and property." The petition was dated and filed

November 25, 1941, and on the same day Mrs. Quam appeared in open court and consented to the appointment of a guardian. By order also dated November 25, 1941, the county court appointed the Madison Trust Company (later the Madison Bank & Trust Company) as guardian. Such guardianship continued as long as Mrs. Quam lived.

On October 15, 1942, Attorney Lester C. Lee, of Madison, received a telephone call at his office from Dr. Puls, pastor of Luther Memorial Church. Dr. Puls was then at the residence of Mrs. Quam and he informed Lee that Mrs. Quam desired to confer with Lee with respect to drafting a will. Up until that time Lee had performed no legal services for Mrs. Quam and was not acquainted with her except that he had seen her in attendance at Luther Memorial Church. During the years 1942 and 1943, Mrs. Quam frequently had been at the office of Sachtjen & Braathen consulting with them with respect to the guardianship. The Quam home was some 18 blocks from Lee's office. Upon Lee's arriving at the Quam home, Dr. Puls introduced him to Mrs. Quam. Lee then held a conference of some twenty minutes to one-half-hour duration with her in order to gather information to draft her will. He saw no other person there but Dr. Puls. Dr. Puls was not present in the same room with Lee and Mrs. Quam during such conference.

During the conference Lee asked Mrs. Quam questions as to who her relatives were and what her property consisted of, and he made a memorandum of the data she supplied, including her desired testamentary disposition of her estate. Such memorandum is one of the exhibits in the record. The one inaccuracy in the data supplied by her was that she had a brother Edward, when in fact she had never had a brother by that name. However, she did not include Edward among the beneficiaries to whom she desired to

bequeath her estate, and Lee assumed Edward was dead. Mrs. Quam's age does not appear in the record except that she had made statements for several years about the time of such conference that she was seventy-eight. Her personal property held in the guardianship at this time amounted to approximately $17,000. There was some appreciation in value thereafter, and before her death in 1957 the house had been sold by the guardian. As a result the total value of her estate at time of death was approximately $25,000.

After returning to his office, Lee drafted a will in accordance with Mrs. Quam's directions which is identical to the instrument propounded as her last will in the instant proceeding except for the date. Lee had arranged with Mrs. Quam to come to his office to sign the will but she did not come. The matter stayed in abeyance until shortly prior to March 18, 1943. Arrangements were then made by Lee for Mrs. Quam to come to the office of Dr. Vingom, a physician who had been treating her, and there sign her will on March 18, 1943. The record is silent as to who contacted Lee and requested that such arrangements be made. Lee retyped the will as previously drafted by him in order to change the date from October, 1942, to March, 1943, and he and Mrs. Quam met at Dr. Vingom's office on March 18, 1943. Lee read the will to Mrs. Quam and she then executed the same in the presence of the three attesting witnesses: Lee, Vingom, and Vingom's secretary. Lee took the executed will with him and deposited it with the register in probate of Dane county.

An unexplained and puzzling circumstance is the fact that on June 17, 1943, Mrs. Quam wrote the following letter to Attorney Sachtjen:

"I would like very much for you to get from the Madison Trust Co. an itemized list of all my possessions there, and also a copy of my last will of 1938 which you have, because

I want these in making out a new will. Kindly send these at your earliest convenience. And oblige."

The firm of Sachtjen & Braathen then had Mrs. Quam's 1938 will in their possession and they made a copy of the same and mailed it to her on June 21, 1943, together with a copy of the guardianship inventory. However, nothing more was heard from her about her intention to draft another will.

Judge SACHTJEN, Braathen, a neighbor, Fred Hall, and Stanley Dokken all testified that in their opinion Mrs. Quam did not possess on or about March 18, 1943, sufficient mental capacity to make a will. On the other hand, Lee and Dr. Vingom testified that she did. It was on this disputed testimony that the learned trial court determined and found that she did possess testamentary capacity at the time the will was executed. It is unnecessary to review the evidence bearing on this, because the appellants base their contention on this appeal on the issue of mental capacity on the ground that Mrs. Quam was suffering from an insane delusion which materially affected the making of the will.

As proof of such contention the appellants cite the following clause of the propounded will:

"I state here that although Stanley Dokken was the party instrumental in starting guardianship proceedings against me, of which I am fully aware at this time, for the sake of my deceased sister Julia, I forgive him for the things that he has done, and make this bequest to him to show that I have done so."

The undisputed evidence is that Stanley Dokken did not have any part in the institution of the guardianship proceeding and was not present in county court when the petition was presented and the guardian appointed. Therefore, the testatrix's expressed belief that he had been instrumental in

starting such proceeding was a mistaken one. However, all mistaken beliefs are not insane delusions. In the recent case of *Will of Riemer* (1957), 2 Wis. (2d) 16, 85 N. W. (2d) 804, it was held that the test of whether a delusion is an insane one is not whether there is any evidence upon which a testator might base such delusion, but rather whether a sane person could have drawn the same conclusion from the evidence. See also Comment Note by Lee M. Modjeska entitled, "Psychology and Law: An Examination of the Concept of Insane Delusions," 1960 Wisconsin Law Review, 54, 68 *et seq.*

There was evidence upon which a sane person in Mrs. Quam's position could have arrived at the conclusion that Stanley Dokken had been instrumental in starting the guardianship proceedings. At the time such proceeding was commenced, Stanley Dokken was her only blood relative residing in Dane county. He had evinced an active interest in her by calling at her home once or twice a week for a long time. The petition listed on its face his name and address as the only next of kin residing in the county, and no other relative was named in the petition. Furthermore, both Martin Haug and Attorney Braathen had conferred with him about filing the petition, and the probability that Mrs. Quam may have learned of this should not be ruled out. It is a fairly prevalent misconception among laymen that before a guardian is appointed some relatives must initiate the proceeding. In view of these circumstances, we cannot hold as a matter of law that only an insane person could have indulged in the delusion entertained by Mrs. Quam that Stanley Dokken had been instrumental in starting the guardianship proceeding.

Even if it be assumed that such delusion were an insane one, it would not invalidate the will unless it materially affected the making of the testamentary disposition embodied

therein. *Will of Shanks* (1920), 172 Wis. 621, 624, 179 N. W. 747, and *Estate of Joslin* (1958), 4 Wis. (2d) 29, 34, 89 N. W. (2d) 822. Mrs. Quam, in the will under attack, expressly stated that she forgave Stanley Dokken for what he had done and made the bequest to him to show that she had done so. Such a self-serving statement under some circumstances would be entitled to little or no weight. However, here the truth of such assertion is corroborated by the fact that Stanley was bequeathed the same amount as was his brother Gerhard. There is no claim made that Mrs. Quam ever thought that Gerhard, who resided at Scarsdale, New York, had had anything to do with instituting the guardianship proceeding.

The appellants point out that under the 1938 will Stanley was treated the same as the other nephews and nieces of the testatrix, while under the 1943 will the four nephews and nieces named in the residuary clause will each receive several times as much as he. However, if Mrs. Quam had died immediately after making the 1943 will this discrepancy in size of shares would have been much less. Under the 1943 will as drafted, Stanley and Gerhard's $500 bequests must be paid in full before there will be any residue to divide among the other nephews and nieces. The testatrix may well have thought that part of her estate would be consumed between the time of making the will and her death, and that the likelihood of such estate decreasing was greater than the probability of its increasing. The trial court's determination that the delusion entertained with respect to Stanley did not materially affect the making of the will is not against the great weight and clear preponderance of the evidence and, therefore, must stand.

We pass now to consideration of the issue of undue influence. It is the position of the appellants that the will was procured by undue influence exercised upon the testatrix by

Dr. Puls, pastor of the church to which she bequeathed $10,000 of her $25,000 estate.

The four elements necessary to be proved in order to invalidate a will on the ground of undue influence were once again set forth in *Will of Freitag* (1960), 9 Wis. (2d) 315, 317, 101 N. W. (2d) 108, as follows: "1. A person who is susceptible of being unduly influenced by the person charged with exercising undue influence; 2. the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor; 3. a disposition on the part of the party charged, to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another; 4. a result caused by, or the effect of such undue influence." See also *Estate of Fillar*, post, p. 141, 102 N. W. (2d) 210.

Both Judge SACHTJEN and Attorney Braathen stated positive opinions that Mrs. Quam was very susceptible to influence by other persons as of the time of making the 1943 will. Furthermore, they gave illustrations of conduct on her part that clearly demonstrated such susceptibility. In the words of Judge SACHTJEN, "The one who was with her last would influence her to do anything, if he wanted to by talking to her."

Dr. Puls did have the opportunity to importune Mrs. Quam to leave a large bequest to his church during the morning of October 15, 1942, when he was with her alone in her home before the arrival of Attorney Lee. In the light of the foregoing testimony as to her great susceptibility to influence by others, sufficient opportunity was afforded for the exercise of undue influence.

Dr. Puls was not called to testify in this will-contest proceeding. The sole evidence relied upon by the appellants to establish a disposition on the part of Dr. Puls to exercise

undue influence on the testatrix is the fact that he telephoned a lawyer unknown to her to come to the home for a conference with her about drawing a will. At that time Sachtjen & Braathen were the lawyers who had been handling her legal matters and had probated her late husband's will. Sachtjen & Braathen had attended to seeing that Dr. Puls was paid his honorarium for conducting the funeral service of Mr. Quam. This evidence standing alone is insufficient to compel a finding that there was a disposition on the part of Dr. Puls to exercise undue influence.

Furthermore, it cannot be held as a matter of law that the bequest by testatrix of approximately 40 per cent of her estate to the church with which she had close ties indicates a result of undue influence when she had no close relatives who had a moral claim to her bounty. There is no evidence that her sister Mary Purnis, Stanley or Gerhard Dokken, or any of the other nephews and nieces, were in necessitous circumstances. The appellants urge that because in her 1938 will Mrs. Quam had only bequeathed $200 to a church, no satisfactory explanation has been given why five years later she would make such a radical change in the testamentary disposition of her estate so as to bequeath a church $10,000. This argument overlooks the fact that in 1938 her husband was still living and apparently she then had but a trifling estate of her own. The big change in circumstance which occurred between 1938 and 1941 was the death of the husband and his bequeathing approximately $19,000 of real and personal property to her.

This, therefore, is not a proper case in which to invoke the rule that where three of the four elements have been established by the required proof of clear and convincing evidence, only slight evidence as to the fourth element is necessary to prove its existence. In the instant case, only

two of the four elements have been clearly established. Furthermore, the only opportunity which the evidence discloses that Dr. Puls had in which to exercise undue influence upon testatrix occurred in October, and the will was not executed until March. This in itself gives rise to strong inference that no undue influence had been exercised by him.

*By the Court.*—Judgment affirmed.